ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Patricia I. Romero, Inc. d/b/a Pacific West | )  ASBCA No. 63093 |
| Builders | ) |
| | ) |
| Under Contract No. N62473-08-D-8655 | ) |

APPEARANCE FOR THE APPELLANT:     David A. Rose, Esq.
                                                                    Rose Consulting Law Firm
                                                                    Valdosta, GA

APPEARANCES FOR THE GOVERNMENT:     Craig D. Jensen, Esq.
                                                                        Navy Chief Trial Attorney
                                                                    Joshua S. Kauke, Esq.
                                                                        Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MCLISH ON THE
GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

This appeal involves disputes arising under a task order issued by the Naval Facilities Engineering Systems Command Southwest (NAVFAC or the government) to Appellant Patricia I. Romero Inc. (d/b/a Pacific West Builders) (PWB) for repair work at Buckley Air Force Base in Aurora, Colorado. PWB asserts that NAVFAC required extra work without due compensation or time extensions, improperly withheld superior knowledge, and caused numerous delays that resulted in extra costs to PWB. PWB also seeks interest under the Prompt Payment Act.

The government moves for summary judgment on each of PWB's claims on the grounds that (1) the claims are barred by the applicable statute of limitations, (2) certain claims are barred by accord and satisfaction, and (3) the claim for interest is barred by the Prompt Payment Act. We dismiss some of the claims for lack of jurisdiction and grant summary judgment in the government's favor except as to two of the remaining claims.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

I. The Contract

The contract at issue is a task order issued under an indefinite-delivery, indefinite-quantity, multiple award construction contract. The underlying contract is Contract No. N62473-08-D-8655, awarded by the NAVFAC to PWB on September 22,

2008.  (R4, tab 1 at 1)[1]

The task order at issue was awarded on or about September 20, 2011, when NAVFAC issued PWB Task Order No. 0003 for the Denver NOSC Repair Project at Buckley Air Force Base in Aurora, Colorado in the amount of $3,431,294.00 (R4, tab 4 at 208-09).  The original contract completion date was October 8, 2012, and the task order included a liquidated damages clause (R4, tab 4 at 225).

Under the task order, PWB was to make renovations and repairs to existing buildings referred to as Buildings 1301, 1302 and 1304 and associated areas (R4, tab 2 at 118).

## II.  Contract Modifications

During performance, eight written modifications were made to the Contract.  Seven of them were made bilaterally by both of the parties (Modification Nos. 1-3, 5-8) (R4, tabs 5-7, 9-12).  One the government issued unilaterally (Modification No. 4) (R4, tab 8).

After performance was completed, on or about November 9, 2015, the government unilaterally issued Modification No. 9, which assessed liquidated damages against PWB for alleged late completion of the work (R4, tab 13).  Modification No. 10, discussed below, was issued on September 28, 2021.  It, among other things, rescinded the liquidated damages assessed in Modification No. 9.  (R4, tab 14)

## III.  PWB's Disagreement with CPARS Evaluation

Meanwhile, on or about September 24, 2015, NAVFAC issued a performance evaluation under the Contractor Performance Assessment Reporting System (CPARS) regarding PWB's performance of the contract.  The CPARS evaluation apparently criticized PWB's performance of the contract in several respects.[2]

PWB submitted a letter to the Contracting Officer dated December 15, 2015, taking issue with the negative aspects of the CPARS evaluation (R4, tab 18 at 404-28).

---

[1] The government paginated the Rule 4 files with a prefix and several zeroes before each page number, e.g., "GOV000001."  For ease of reference, we cite only the page numbers without the prefix and leading zeroes.

[2] The CPARS evaluation itself is not in the Rule 4 file or otherwise included in the parties' submissions.  Our description of the CPARS evaluation is thus based on references to it in documents that are in the record, primarily PWB's December 15, 2015, letter to the contracting officer disputing the accuracy of the evaluation (R4, tab 18 at 404-28).

Attached to the letter were 53 exhibits (*id.* at 429-606).  The December 15, 2015, letter alluded to PWB's intent to submit a claim challenging the CPARS evaluation, as well as the assessment of liquidated damages, and indicated PWB would seek monetary relief for various acts and omissions by NAVFAC during contract performance (*id.* at 404-28).

## IV.  PWB's Certified Claim, Contracting Officer's Final Decision, and Appeal

As forecast in the December 15, 2015, letter, PWB eventually did submit a certified claim to the contracting officer, but not until March 23, 2021 (R4, tabs 17-18).[3]  The claim attached and "incorporated . . . by reference for all purposes" the December 15, 2015, letter from PWB to the Contracting Officer (R4, tab 17 at 396)

PWB's claim first contended that the CPARS evaluation was unfair and "substantially incorrect" and should be replaced with a positive or, at a minimum, a neutral rating (R4, tab 17 at 396, 398).  Second, in addition to the CPARS claim, PWB alleged that "PWB has experienced actual damages and seeks the removal of liquidated damages and the final payment of the funds due under the contract of $366,193.48, which includes the additional amount of Modification 08 . . ." (*id.* at 398).  Modification No. 8 had added a requirement to install a glycol feeder system and add glycol solution to the air handler system (R4, tab 12).

Third, the claim stated that "PWB also seeks an additional $324,923.72 for costs due to additional work and delay (See Exhibit 3)" (R4, tab 17 at 398).  Exhibit 3 to the claim, entitled "PWB Additional Costs Breakdown," contained PWB's calculation of its claimed additional costs (R4, tab 18 at 611).  The claim letter alleged that NAVFAC caused delays and extra costs in the way it reviewed and commented on design documents for the SCIF[4]; by failing to advise PWB of security requirements in the SCIF; by failing to disclose that only one source could perform work on the controls system; and by failing to adequately maintain the existing hot water supply system, allegedly causing failure of two new air handling units (R4, tab 17 at 397).  The December 15, 2015, letter that PWB incorporated into its claim had raised those same contentions and also alleged various other instances of delay and uncompensated costs for which PWB claimed the government was responsible (R4, tab 18 at 404-28), as summarized here:

---

[3] The Government suggests that the claim may not have been fully submitted until March 30, 2021, when the contracting officer received the exhibits referenced in the March 23, 2021, submission.  We assume for purposes of this motion that the claim was submitted on the earlier date.

[4] A SCIF is a sensitive compartmented information facility.

3

|  | **Event Giving Rise to Claim** | **Date of Alleged Event** |
|---|---|---|
| 1. | PWB was directed not to begin work in Enclave on schedule (R4, tab 18 at 423) | December 17, 2012-February 4, 2013 (*id.* and 571-72) |
| 2. | PWB denied access to begin flooring work in Rooms 1-208, 1-212, 1-216 and 3-204 (*id.* at 423) | December 13, 2012– January 3, 2013 (*id.* and 573-74) |
| 3. | Work in Room 3-109 stopped for Government to undertake mold abatement (*id.* at 423) | January 23, 2013-May 31, 2013 (*id.* and 575) |
| 4. | Subcontractors denied bases access because sponsor's authorization expired (*id.* at 423) | March 13-25, 2013 (*id.* and 577) |
| 5. | Renewal base passes denied for drywall crew for unknown reason (*id.* at 424) | April 1-16, 2013 (*id.* and 578-80) |
| 6. | Site work stopped to accommodate an advancement exam (*id.* at 424) | March 5-11, 2013 (*id.*) |
| 7. | Delay waiting for Government to clear closet where CRAC units to be located and to perform work relating to door security locks (*id.*) | October 2013 (*id.* and 581-82) |
| 8. | PWB was asked to re-locate ADA/ABA compliant restroom to different location at no cost, to which PWB agreed (*id.*) | Unstated |
| 9. | Escorts into Enclaves not available (*id.* at 424) | "Frequently" (*id.*) |

PWB also claimed entitlement to Prompt Payment Act interest "on the final contract amount, beginning at the time of interception [sic], on October 26, 2015, and prompt payment act interest for the amount of this claim" (R4, tab 17 at 398).

The contracting officer issued a final decision on PWB's claim on September 13, 2021, granting it in part and denying it in part (R4, tab 19). Without addressing the merits of PWB's challenge to the assessment of liquidated damages, the

contracting officer agreed to rescind the liquidated damages via a unilateral contract modification (R4, tab 19 at 615). In addition, while disagreeing with PWB's assertions about the CPARS ratings, the contracting officer agreed to change all "Unsatisfactory" ratings in the CPARS evaluation to "Satisfactory," and change the narrative for each rating (R4, tab 19 at 615).

The final decision went on to deny PWB's claim for $324,923.72 in costs due to additional work and delay. The contracting officer found the claims untimely because they had accrued more than six years prior to submission of the claim (R4, tab 19 at 615-16). The decision also denied PWB's claim for Prompt Payment Act interest and instead agreed to pay interest under the Contract Disputes Act on the rescinded liquidated damages (R4, tab 19 at 616).

NAVFAC then unilaterally executed Modification No. 10, effective September 28, 2021. That modification rescinded the assessment of liquidated damages and added Contract Disputes Act interest on that amount to the total task order price. With respect to the CPARS evaluations, Modification No. 10 stated that, despite the contracting officer's agreement to change PWB's CPARS ratings and narratives, doing so was "no longer practical." Due to their age, the CPARS evaluations had been automatically archived and were no longer visible or accessible on the CPARS website. Accordingly, changing the CPARS evaluations would be "administratively burdensome and result in no harm or benefit to Pacific West Builders or the government." (R4, tab 14 at 382)

PWB filed this appeal on December 7, 2021. It seeks relief in the amount of $324,953.72 in "additional work and delay costs," $50,419.80 for "interest on withheld contract balance," and $46,098.29 for "interest on additional funds expended" (compl. ¶ 106).

## V. PWB's Complaint

PWB's complaint breaks down PWB's claims for relief into three categories: (1) "Unreasonable Delay/Violation of Duty to Cooperate," (2) "Failure to Disclose Actual Construction Requirements of SCIFF [sic] Room," and (3) "Additional Delays" (compl. ¶¶ 3, 6-7).[5] PWB also contends that NAVFAC is responsible for costs incurred repairing two air handling units (AHU #2 and AHU #8) (*see* Board Order dtd. February 16, 2023 (memorializing conference call with the parties)).

---

[5] After inquiry from the Board, PWB confirmed that it is no longer pursuing its claims relating to liquidated damages or CPARs evaluations (app. notice dtd. March 17, 2023).

5

### a. Alleged Unreasonable Delay/Violation of Duty to Cooperate

PWB makes two assertions in this category. First, PWB faults NAVFAC for issuing modifications to the Contract that, in PWB's view, did not provide for sufficient time extensions to the contract completion date and did not adequately compensate PWB for its extended overhead costs (compl. ¶¶ 21-25). Second, PWB contends that the government is responsible for delays and additional costs resulting from the alleged failure to disclose that only a single source could perform certain required work on the Direct Digital Control (DDC) system (compl. ¶¶ 26-35).

### i. Modifications

With respect to contract modifications, PWB's complaint does not make clear which modifications it contends provided insufficient time extensions or price increases (*see* compl. ¶¶ 23-25). PWB's claim to the contracting officer referred to certain instances of alleged delay and NAVFAC's alleged refusal to grant proper time extensions or reimburse additional costs but did not identify the specific modifications it disputes (*see e.g.*, R4, tab 18 at 421).

Of the ten contract modifications, Modification Nos. 1-8 were all issued before 2015, with the last one, Modification No. 8, being issued on December 11, 2014. PWB was aware of the terms of each such modification on or around the date it was issued. (R4, tabs 5-12)[6]

### ii. DDC System

With respect to the DDC system, the complaint alleges that the performance verification testing (PVT); test, adjust and balance (TAB); and commissioning of the HVAC systems "were significantly delayed because PWB could not complete the scope of work relative to the DDC Controls" (compl. ¶ 27). PWB contends that NAVFAC failed to disclose to PWB that work on the DDC system could be performed only by a single source, to which the system was proprietary (compl. ¶ 28). PWB's claim to the contracting officer contained additional information, contending that only one licensed distributor in the area was authorized to work on the proprietary system, and PWB found that subcontractor's work to be unsatisfactory (R4, tab 18 at 406). This "forced PWB to seek government permission to replace the Solidyne proprietary system with a Honeywell open license system" (*id*.). The government gave PWB

---

[6] PWB's Complaint does not take issue with Modifications No. 9 or 10. Modification No. 9 assessed liquidated damages. Modification No. 10, which was issued after the contracting officer's final decision, rescinded those liquidated damages and also addressed the CPARS issue, neither of which are the subject of PWB's remaining claims.

permission to replace the Solidyne system with a Honeywell system in Modification No. 7, which was executed bilaterally on September 8, 2014 (R4, tab 11). PWB faults NAVFAC for delay and failing to provide compensation to PWB for the upgraded DDC controls (compl. ¶¶ 25, 29). PWB also asserts that the alleged failure to disclose resulted in extensive litigation between PWB and a subcontractor (compl. ¶¶ 27-35).

### b. Alleged Failure to Disclose Actual Construction Requirements of SCIF Room

PWB alleges that, during performance, NAVFAC verbally changed the location of the Computer Room Air Conditioning (CRAC) units that were to be installed in an area referred to variably as the SCIF or the Enclave (compl. ¶¶ 36-44). PWB alleges that, although PWB made its final design submittal on September 25, 2012, NAVFAC did not provide comments until July 24, 2013, which made "significant changes to the known scope of work in the [Enclave], pushing the start of that work until 8 November 2013, AFTER the Contract Completion Date" (compl. ¶ 43 (emphasis in original); *see also* R4, tab 18 at 412-21).

PWB finds fault with NAVFAC for not earlier disclosing that the change of location of the CRAC units would result in significant additional work in the SCIF and then refusing to agree to compensate PWB for its additional costs or extend the contract completion date to account for the additional work (compl. ¶¶ 36-44).

### c. Claims for Additional Delays

PWB's complaint describes numerous additional events that it contends caused delay to the completion of the contract (compl. ¶¶ 47-98). It then alleges that these alleged delays had a cumulative "ripple effect" on the overall project and caused disruption to "multiple scopes of work, multiple trades and other subcontractors" (*id.* ¶¶ 99-100). These alleged causes of delay were not raised in PWB's claim to the contracting officer (*compare* compl., *with* R4, tab 18).

### d. Repair of AHU #2 and AHU #8

PWB's complaint, while making general allegations relating to the hot water system and glycol, does not make any specific allegations about the causes of damage to or the repairs of AHUs #2 or #8 (*see, e.g.*, compl. ¶¶ 75-78, 88). PWB's certified claim, however, contended that the government was at fault for the failure of two new air handling units PWB had installed, referred to as AHU #2 and AHU #8 (R4, tab 18 at 406, 409-12). After inquiry from the Board, PWB confirmed that it intends to pursue the claims relating to AHUs #2 and #8 that were asserted in its certified claim (*see* Board Order dtd. February 16, 2023).

7

The claim asserted that the AHUs failed because the government did not properly and adequately maintain the existing hot water supply system, including neglecting to add glycol to the system to keep it from freezing. PWB claimed that NAVFAC improperly required PWB to repair the units at its own expense. (R4, tab 18 at 406, 409-12)

AHU #2 failed in January 2014. Apparently believing that the failure was a result of an installation problem caused by its subcontractor, PWB repaired AHU #2 at its own expense (*id.*). AHU #8 then failed on or about November 7, 2014. After the failure, an exterior pipe supplying hot water to AHU #8 froze and burst. This revealed that the AHU had failed because the water contained little or no glycol, which would have prevented the pipe from freezing. The absence of sufficient glycol, according to PWB, was the government's fault. (R4, tab 18 at 411-12)

By no later than February 2015, PWB had concluded that both AHU #2 and AHU #8 had failed because of the government's failure to maintain adequate levels of glycol in the system. In correspondence dated February 11, 2015, PWB contended to NAVFAC that "the government's failure to properly maintain the [heating hot water] system with an adequate supply of glycol" was responsible for damage to AHU #8 (R4, tab 18 at 475). According to PWB, the government understood and "acknowledged" as early as December 11, 2014, that insufficient glycol was the cause of the AHU #2 and #8 failures by communicating about and executing bilateral Modification No. 8, which required installation of a glycol feeder system and glycol (R4, tab 18 at 412). In discovery, PWB admitted that it had contended by no later than February 11, 2015, that the government was responsible for the damage to AHU #2 and #8 (gov't mot., ex. 4, responses to interrog. nos. 13-14).

PWB had also incurred costs toward the diagnosis and repair of the AHU failures by February 2015. PWB's subcontractor invoiced it for repair work on AHU #2 on June 1, 2014. (Gov't mot., ex. 3 at GOV_MSJ_0060 (subcontractor invoice); ex. 5 at GOV_MSJ_0078-79 (resp. to interrog. no. 6); ex. 6 at GOV_MSJ_0094-95 (2d resp. to interrog. no. 6)) And by no later than December 11, 2014, PWB had undertaken steps to repair AHU #8, including having its subcontractor investigate the cause of the failure, which led to the issuance of Modification No. 8 on December 11, 2014 (gov't mot., ex. 5 at GOV_MSJ_0082 (resp. to interrogatory no. 12); R4, tab 12 at 373-77)).

8

## VI.  The Affidavit of Patricia Romero

Appellant's response to Respondent's summary judgment motion relies upon an affidavit of Patricia I. Romero, PWB's owner and principal (app. resp., ex. 1).[7] Ms. Romero executed each of the bilateral contract modifications on PWB's behalf (R4, tabs 5-7, 9-12).

In her affidavit, Ms. Romero testifies that PWB was under economic duress when she executed Modification No. 7, in that she was told by the contracting officer that the task order would be terminated for default if she did not execute Modification No. 7 at no cost (app. resp., ex. 1, ¶ 3).  A termination for default would have devastated the company and most likely bankrupted it (*id.* ¶ 4).  Ms. Romero felt she also had no choice but to execute Modification No. 8 if it wished to remain in business (*id.* ¶ 6).

Ms. Romero further testifies that "the climate . . . under which we were performing during all this was extremely hostile towards our small economically disadvantaged business" (*id.* ¶ 9).  NAVFAC employees yelled at her loudly and called her "ignorant," and her "perception of all this was it was quite abusive and derisive" (*id.* ¶ 10).  "The whole atmosphere was one of fear of losing everything if we did not strictly comply with all demands despite their being in or out of scope.  We were literally at their mercy" (*id.* ¶ 12).  She states that "[w]e simply signed whatever we were provided to avoid termination" (*id.* ¶ 13).

Ms. Romero's affidavit also states that, before PWB submitted its claim, a NAVFAC contracting officer twice asked her to hold PWB's claim "in abeyance" (*id.* ¶ 14).  Although not specific as to dates, Ms. Romero testifies that the first such occasion was "immediately after the government re-posted the original performance evaluation and I responded, telling them that I had sent a lengthy response to the original evaluation to the Contracting Officer along with numerous back up documents and that I intended to file a claim" (*id.*).  As to the second occasion, Ms. Romero states, again without reference to a particular date, that the contracting officer "called me and said the matter had been referred to her and asking me to hold everything in abeyance" (*id.*).  She states that "[w]e were acting in good faith on her requests to stay

---

[7] Appellant's response to the government's motion cited to Ms. Romero's affidavit as Exhibit 1 to the response, but no Exhibit 1 was included.  Government counsel obtained the affidavit from PWB's counsel and provided it to the Board when it filed its reply brief (Bd. corr. email dtd. December 21, 2022).  We refer to it as Exhibit 1 to appellant's response.

our filing" (*id.* ¶ 15).[8]

The government moves for summary judgment, contending that (1) PWB's claims were not submitted to the contracting officer within six years of when they accrued, as required by 41 U.S.C. § 7103(a)(4)(A) ("[e]ach claim by a contractor against the Federal Government relating to a contract . . . shall be submitted within 6 years after the accrual of the claim"), (2) PWB's claim relating to the DDC Controls and additional engineering and TAB and commissioning is barred by accord and satisfaction, and (3) PWB's claim for Prompt Payment Act interest fails as a matter of law. Although the government's motion did not question the Board's jurisdiction to entertain PWB's claims, the Board must satisfy itself that it possesses jurisdiction before it may adjudicate the claims.[9]

## I. Jurisdiction

Under the Contract Disputes Act (CDA), we lack jurisdiction to entertain a claim that has not previously been the subject of a written claim to the contracting officer. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc); *Madison Lawrence, Inc.*, ASBCA No. 56551, 09-2 BCA ¶ 34,235 at 169,206. The proponent of the Board's jurisdiction bears the burden to establish that this jurisdictional prerequisite is satisfied as to all elements of its claim. *Walsky Constr.*

---

[8] In an email exchange with the contracting officer on May 20, 2021 (*i.e.*, after PWB had submitted its claim on March 23, 2021), Ms. Romero stated "[i]t has been close to two years since you last asked me to hold the claim in abeyance while you reviewed the matter to see if it could be resolved at this level" (app. resp., ex. 2 at 1). The contracting officer's response did not take issue with that statement (*id.*). We infer that at some point in 2019 the contracting officer asked PWB to hold its claim in abeyance.

[9] By Order dated January 30, 2023, the Board raised with the parties whether it may lack jurisdiction over the claims asserted in paragraphs 47-98 of PWB's complaint because they did not appear to have been asserted in PWB's certified claim and subsequently directed the parties to brief the issue (Bd. Order dtd. February. 16, 2023). PWB submitted a brief on March 9, 2023, that did not address the jurisdictional issue but instead was an unauthorized sur-reply on the merits of the government's summary judgment motion. The government responded with a brief on March 23, 2023, which contended that we lack jurisdiction over the claims for "Additional Delay" asserted in PWB's complaint and requested that we disregard PWB's submission. Because our rules do not permit sur-replies without permission, we have not considered PWB's March 9, 2023, brief in our resolution of this motion.

*Co.*, ASBCA No. 52772, 01-2 BCA ¶ 31,557 at 155,856. A valid claim must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Northrop Grumman Computing Sys. v. United States*, 709 F.3d 1107, 1112 (Fed. Cir. 2013). We are required to examine whether a claim submitted to us "is the 'same claim' as the one presented to the contracting officer." *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 776 (Fed. Cir. 2021). "The focus is on whether the contracting officer was given 'an ample pre-suit opportunity to rule on a request, knowing at least the relief sought and what substantive issues are raised by the request.'" *Id.*

Here, the Board lacks jurisdiction over the claims asserted in paragraphs 47-98 of PWB's complaint because PWB's certified claim to the contracting officer did not give the contracting officer adequate notice of the basis of those claims. The certified claim did not notify the contracting officer of PWB's contention that it suffered compensable or excusable delays because of the events described in those paragraphs of its complaint. The same is true of paragraphs 99-100 of the complaint, which appear to assert a cumulative impact or disruption claim arising from the delays alleged in the preceding paragraphs but were not addressed in PWB's claim to the contracting officer. The omission of these allegations from the certified claim deprived the contracting officer of any meaningful opportunity to address them, defeating a key purpose of the CDA's requirement that claims first be submitted to the contracting officer before the Board may adjudicate them.

Accordingly, the claims asserted in paragraphs 47-100 of PWB's complaint are dismissed for lack of jurisdiction.

## II. Standard of Review for Summary Judgment

We next address the government's motion for summary judgment as to the claims asserted by PWB over which the Board does possess jurisdiction.

"Board Rule 7(c) permits summary judgment motions and 'looks to Rule 56 of the Federal Rules of Civil Procedure for guidance.'" *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,099 (quoting Board Rule 7(c)(2)). Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). The applicable substantive law identifies which facts are material and might affect the outcome of the appeal, thus precluding the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has satisfied its initial burden, the opposing party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v.*

*Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  Our job is not "to weigh the evidence and determine the truth of the matter, but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249).  A dispute is genuine only if, on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant. *Liberty Lobby*, 477 U.S. at 248.  On summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. *Crown Operations,* 289 F.3d at 1375.

## III.  The CDA's Statute of Limitations

The government contends that all of PWB's claims are time-barred.  The Contract Disputes Act requires in pertinent part that "each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. §7103(a)(4)(A).  While the CDA does not define the term "accrual," the Federal Acquisition Regulation (FAR) defines "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201.  A party's failure to submit a claim within six years of accrual is an affirmative defense to the claim, for which the party invoking the defense bears the burden of proof. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988 at 175,823.

"[W]hen a claim accrued is determined in accordance with the FAR, the conditions of the contract, and the facts of the particular case." *Triple Canopy, Inc. v. Sec'y of the Air Force*, 14 F.4th 1332, 1339 (Fed. Cir. 2021) (quoting *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016)); *Elec. Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020).  "The issue of 'whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.'" *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1381 (Fed. Cir. 2012) (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)).  The events fixing liability should have been known when they occurred unless it is reasonable to find they have been either concealed or were "inherently unknowable" at that time. *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017.

## IV.  The Claims Accrued More Than Six Years Before PWB Submitted them to the Contracting Officer

PWB submitted its certified claim to the contracting officer no earlier than March 23, 2021.  To fall within the six-year statute of limitations, therefore, PWB's

claims must have accrued no earlier than March 23, 2015.

As discussed in more detail below, the government's motion points to record evidence establishing that the alleged events underlying all but two of PWB's claims occurred before March 23, 2015, that PWB was or should have been aware of those events at or around the time they occurred, and that PWB incurred at least some cost from each alleged event prior to that date. PWB has not come forward with evidence to the contrary.

Instead, PWB makes two general arguments going to the accrual date of its claims. First, PWB argues that its claims accrued after March 23, 2015, because it did not know the "sum certain" of its claims until after that date (app. resp. at ¶¶ 26-27, 46). PWB emphasizes in particular that it could not submit a claim relating to the DDC system until litigation with its subcontractor over that issue had been resolved (*id.* at ¶ 46). This argument is without merit. We have consistently held that "[w]hen monetary damages are alleged, some extra costs must have been incurred before liability can be fixed and a claim accrued, but there is no requirement that a sum certain be established." *Macro-Z Tech.*, ASBCA No. 60592, 19-1 BCA ¶ 37,358 at 181,657 (quoting *The Boeing Company*, ASBCA No. 58660, 15-1 BCA ¶ 35,828 at 175,190); *Kellogg Brown & Root Servs.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988, 175,824 *McDonnell Douglas Services, Inc.*, ASBCA No. 56568, 10-1 BCA ¶ 34,325 at 169,528; *Robinson Quality Constructors,* ASBCA No. 55784, 09-1 BCA ¶ 34,048, 168,396; *Gray Personnel*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,476. It is enough that some dollar figure can be placed on the claim, even if the total amount that will eventually be claimed cannot yet be determined. *Macro-Z Tech.* at 181,657-58. The amount of the claim can be adjusted as further information is developed, as "[c]ourts and boards have readily adjudicated properly certified claims that were later modified in the amount sought, as additional cost information became available." *Id.* at 181,658 (quoting *J.S. Alberici Construction Co. & Martin K. Eby Construction Co. (JV)*, ENG BCA No. 6179, 97-1 BCA ¶ 28,639 at 143,008). It follows that PWB's litigation with its subcontractor, even if it may have eventually affected the final amount of PWB's claim, did not delay its accrual.

Second, PWB argues that a single task order cannot give rise to multiple claims, each separately subject to the CDA statute of limitations (app. resp. at ¶ 48). Otherwise, PWB contends, a single task order could lead to hundreds of claims, undermining "judicial economy" and opening the door to "abuse of the system" (*id.*). PWB cites no authority for this novel argument. To the contrary, the statute of limitations runs against each "distinct liability-creating event having its own associated damages." *Certified Constr. Co. of Ky., LLC*, ASBCA No. 58712, 14-1 BCA ¶ 35,662 at 174,571 (quoting *Fluor Corporation*, ASBCA No. 57852, 14-1 BCA ¶ 35,472 at 173,930). PWB having alleged independent and distinct wrongs arising under different legal theories, each having its own associated damages, the statute of

13

limitations runs against each of them separately.

Aside from these arguments, PWB has generally not contested the government's analysis of when PWB's claims accrued. We have reviewed the record and conclude that, with two exceptions explained below, there is no genuine issue of fact that PWB's claims accrued before March 23, 2015 and are therefore time-barred.

### a. Modifications

PWB's claims that NAVFAC issued modifications to the Contract that did not provide for sufficient time extensions to the contract completion date and did not adequately compensate PWB for its extended overhead costs accrued at the time each modification was issued. On the date of issuance, PWB knew or should have known the facts upon which it bases its claim that the modification provided inadequate time or money. PWB also knew or should have known that it had suffered some injury by not being adequately compensated, and therefore could have asserted the claim at that time. While PWB does not make clear which of Modifications Nos. 1-8 are the subject of this claim, that is of no moment because all of those modifications were issued before 2015. Therefore, any claims arising from the terms of these modifications accrued before March 23, 2015.

### b. DDC System

PWB contends that NAVFAC failed to disclose that the existing DDC system was proprietary to a single source and could be worked on by only a single local distributor. PWB subcontracted with that local distributor, but found its work unsatisfactory (R4, tab 18 at 406). As a result, PWB alleges, it was forced to replace the proprietary system with a different system, which caused extensive delay to completion of the performance verification testing (PVT); test, adjust and balance (TAB); and commissioning of the HVAC systems (compl. ¶ 29). PWB also asserts that the alleged failure to disclose resulted in extensive litigation between PWB and a subcontractor (compl. ¶¶ 27-35).

This claim is in the nature of a "superior knowledge" claim. To prevail on such a claim, PWB must show by specific evidence that: (1) the contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration (sometimes stated as "direction"); (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *Todd Pac. Shipyards Corp.*, ASBCA No. 55126, 08-2 BCA ¶ 33,891 at 167,756.

14

In PWB's claim, the "vital information" allegedly not disclosed by the government was that "there was a single source available to work on the Solidyne proprietary DDC controls" (compl. ¶ 28). PWB discovered this fact when it attempted to obtain a replacement DDC controls subcontractor to complete the work but could find no other firm with the license training and certification necessary (R4, tab 18 at 407). That discovery "forced PWB to seek government permission to replace the Solidyne proprietary system with a Honeywell open license system" (*id.*). The government gave PWB permission to replace the Solidyne system with a Honeywell system in Modification No. 7, which was executed bilaterally on September 8, 2014 (R4, tab 11). Thus, by no later than September 8, 2014, PWB had actual knowledge of the facts underlying its superior knowledge claim. It is also undisputed that PWB suffered at least some injury no later than December 11, 2014, when PWB paid its replacement subcontractor $44,800 (gov't mot., ex. 3 at GOV_MSJ_0064-65; ex. 6 at GOV_MSJ_0094-95 (2d resp. to interrog. no. 6)). Accordingly, there is no genuine issue as to the fact that PWB's DDC system claims accrued before March 23, 2015.[10]

### c. Failure to Disclose Actual Construction Requirements of SCIF Room

PWB's claim that NAVFAC verbally changed the location of the Computer Room Air Conditioning (CRAC) units that were to be installed in the SCIF, and then failed to compensate PWB for the resulting extra work or extend the contract completion date, also accrued before March 23, 2015. PWB's own allegations establish that NAVFAC's design comments that made the alleged change were provided on July 24, 2013 (compl. at ¶ 43). At that time, PWB knew or should have known of the facts giving rise to its claim for changed work and that it would incur additional costs as a result.

### d. Claims for Additional Delays

PWB's December 15, 2015, letter to the contracting officer articulated nine additional alleged causes of delay. PWB's own allegations show that the events giving rise to seven of the nine delay claims occurred well before March 23, 2015 (*see* chart in Section IV above). The allegations also make clear that PWB was aware of each of these seven alleged causes of delay at the time they occurred and that PWB would suffer some injury as a result (*id.*). Accordingly, these claims accrued more than six years before PWB submitted its claim to the contracting officer.

For the remaining two alleged delay events ((1) unavailability of escorts into Enclave and (2) direction to re-locate ADA/ABA compliant restroom to different

---

[10] Because we find that this claim is precluded by the statute of limitations, we need not address the government's alternative argument that Modification No. 7 bars the claim under the doctrine of accord and satisfaction.

location at no cost), the dates of the events in question are not clear from the record. While it appears quite likely that these claims also accrued long before March 23, 2015 (and we note that PWB has made no argument that the events in question occurred after March 23, 2015), we are unable to discern from the current record that they definitely did. As a result, the government has failed to meet its burden to establish that there is no genuine issue of fact as to when these two claims accrued and is not entitled to summary judgment as to those claims.

### e. Repair of AHU #2 and AHU #8

PWB contends that the government was at fault for the failure of AHU #2 and AHU #8. PWB was aware of the events fixing the government's alleged liability for this claim by no later than February 11, 2015, when PWB stated its position that NAVFAC, rather than PWB, was responsible for the failure of the units and the resulting additional costs and delays (R4, tab 18 at 475). PWB also incurred expenses toward the diagnosis and repair of the two AHU failures by February 2015. There is no genuine dispute, therefore, that PWB's claim accrued before March 23, 2015.

## V. PWB's Equitable Tolling Argument Lacks Merit

For the reasons explained above, there is no genuine issue of fact that PWB's claims (with two exceptions as noted above) accrued more than six years before PWB submitted its claim to the contracting officer. PWB argues that its claims are nevertheless not time-barred because it is entitled to equitable tolling of the statute of limitations. We disagree.

The CDA's statute of limitations is not jurisdictional and is subject to equitable tolling. *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1322 (Fed. Cir. 2014); *Beechcraft Def. Co., LLC; Textron Aviation Inc.; & Textron Aviation Def., LLC*, ASBCA No. 61743, 23-1 BCA ¶ 38,283 at 185,884. "[E]quitable tolling against the federal government is a narrow doctrine." *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003). Equitable tolling is appropriate "when a litigant has (1) been pursuing his rights diligently, and (2) some extraordinary circumstance 'stood in his way and prevented timely filing.'" *Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 22-1 BCA ¶ 38,074 at 184,906 (quoting *The Adamant Grp. for Contracting and Gen. Trading*, ASBCA No. 60316, 16-1 BCA ¶ 36,577 at 178,136*); see also Menominee Indian Tribe of Wis. v. United States,* 577 U.S. 250, 255 (2016)); *Kamaludin Slyman CSC, ASBCA* No. 62006 *et al.*, 21-1 BCA ¶ 37,849 at 183,794. "[M]ere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as 'where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" *Martinez v. United States*, 333 F.3d at 1318 (quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990)).

PWB seeks equitable tolling because, at some point in 2019, a NAVFAC contracting officer requested that PWB hold its claim in abeyance pending efforts to resolve the issues. Ms. Romero states that PWB was "acting in good faith on her requests to stay our filing." (App. resp., ex. 1 ¶ 27)

Under our precedents, PWB cannot prevail on its equitable tolling theory on these facts. In *Globe Trailer Mfg.*, ASBCA No. 62514, 21-1 BCA ¶ 37,973, the appellant similarly alleged that the government "employed 'misleading tactics' to extend the parties' settlement negotiations beyond expiration of the statute of limitations." *Id.* at 184,420. We held that Globe had failed to assert facts sufficient to establish that an extraordinary circumstance prevented it from filing its claim:

> "[I]n the absence of trickery, once a claim has accrued and the statute of limitations begins to run, 'subsequent communications between [the contractor] and the government about the claim's merits and magnitude [do] nothing to toll it.'" *Ford Lumber & Bldg. Supply, Inc.*, ASBCA No. 61617 *et al.*, 19-1 BCA ¶ 37,407 at 181,847 (quoting Raytheon Missile Sys., ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,018). Globe's allegations of 'misleading tactics' pertain to the government's actions in continuing to negotiate with Globe; however, Globe does not assert that the government made false statements or engaged in "trickery[.]"

*Id.* at 184,420-21. In *Kamaludin Slyman*, the appellant argued that the government had failed "to respond to its inquiries over a number of years" and given "assurances that Kamaludin would be paid." 21-1 BCA ¶ 37,849 at 183,795. We held that this was insufficient to establish a fact dispute sufficient to deny summary judgment. "What Kamaludin has explained here is why it might have thought it did not need to present a claim, not why something stood in the way, preventing it from doing so, as is required." *Id.*

Likewise here, PWB has not shown that some "extraordinary circumstance" prevented it from filing a timely claim, nor that it pursued its claim diligently either before or after NAVFAC asked it to hold its claim in abeyance. PWB argues that we should infer from the government's request that PWB hold off on the claim that the government was attempting "to bait Appellant into losing its substantive right of filing its claim" (app. resp. ¶ 45). PWB, however, offers no evidence that the government acted with any duplicitous intent or otherwise engaged in any misconduct that would justify equitable tolling. While Ms. Romero generally alleges abusive behavior on the part of the government during the project, that alone does not give rise to an inference

17

that the government engaged in misconduct merely by asking Ms. Romero to forestall submitting the claim. Even if PWB had evidence that the government intended to trick PWB into delaying its claim until it was too late, PWB has failed to explain why it waited more than a year after the request to submit its claim. In short, PWB has presented no evidence to show that its delay in submitting the claim was anything other than "'a garden variety claim of excusable neglect' for which equitable tolling provides no relief." *Khenj Logistics Grp*. ASBCA, No. 61178, 18-1 BCA ¶ 36,982, at 180,140 (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755 (2016)).

## VI. Prompt Payment Act Claim

The government is entitled to summary judgment on PWB's claim for Prompt Payment Act (PPA) interest. The PPA provides in relevant part, "the head of an agency acquiring property or service from a business concern, who does not pay the concern for each complete delivered item of property or service by the required payment date, shall pay an interest penalty to the concern on the amount of the payment due." 31 U.S.C. § 3902(a). The PPA further provides that it "does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract." 31 U.S.C. § 3907(c). PWB's task order incorporated FAR 52.232-27, PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (SEP 2005), which further defines the requirements for entitlement to Prompt Payment Act interest (R4, tab 1 at 48).

The government argues that PWB is not entitled to PPA interest for two reasons: (1) PWB never submitted an invoice for the amounts on which it seeks interest, and (2) PPA interest is not owed on disputed amounts. PWB's opposition to the government's summary judgment motion offered no response to these arguments.

In *Dick Pac./ghemm, Jv*, ASBCA No. 55829, 08-2 BCA ¶ 33,937, the Board explained:

> Under the contract's Prompt Payment clause, PPA interest
> is to be paid automatically if a proper invoice was
> received; payment was not made by the due date;
> government documentation authorizing payment was
> processed; there was no disagreement over quantity,
> quality, contractor compliance with the contract, or the
> requested progress payment amount; or, in the case of a
> final invoice, the amount was not subject to further
> contract settlement actions. FAR 52.232-27(a)(3). Interest
> is not required on payment delays due to disagreement

18

between the government and the contractor over the payment amount or other issues involving contract compliance, or on amounts temporarily withheld or retained in accordance with the contract.

*Id.* at 167,942. It is undisputed that PWB did not submit a proper invoice for the amounts on which it seeks interest and that those amounts are in dispute. Accordingly, the claim for PPA interest is without merit. *See Amaratek*, ASBCA No. 59149, 15-1 BCA ¶ 35,808 at 175,125 n.4; *Dillingham Const. Pac. Basin, Ltd.,* ASBCA No. 53284, 03-1 BCA ¶ 32,098 at 158,664.

<u>CONCLUSION</u>

The claims asserted in paragraphs 47-100 of PWB's complaint are dismissed for lack of jurisdiction. The government's motion for summary judgment is granted as to all other claims asserted by PWB, except for its delay claims based on the alleged unavailability of escorts into the SCIF and the government's direction to re-locate an ADA/ABA compliant restroom to a different location. The government's motion for summary judgment is also granted as to PWB's claim for interest pursuant to the Prompt Payment Act.

Dated: May 12, 2023

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63093, Appeal of Patricia I. Romero, Inc. d/b/a Pacific West Builders, rendered in conformance with the Board's Charter.

Dated:  May 16, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals